**[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 48.]**

BUTLER COUNTY BAR ASSOCIATION *v.* MARTIN.

**[Cite as *Butler Cty. Bar Assn. v. Martin*, 1995-Ohio-75.]**

*Attorneys at law—Misconduct—Indefinite suspension—Neglect of an entrusted legal matter—Failure to carry out contract for professional services— Engaging in illegal conduct involving moral turpitude—Conduct that adversely reflects on fitness to practice law.*

(No. 94-2652—Submitted April 18, 1995—Decided August 16, 1995.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 93-68.

———————————

{¶ 1} In a complaint filed on October 18, 1993, relator, Butler County Bar Association, charged that respondent, Scott L. Martin of Middletown, Ohio, Attorney Registration No. 0040205, had violated, *inter alia*, DR 6-101(A)(3) (neglect of an entrusted legal matter), and 7-101(A)(2) (failure to carry out contract for professional services) in the representation of four different clients. A panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court ("board") heard the matter on October 5, 1994. At the hearing, respondent agreed to the panel's consideration of three additional clients' grievances, each alleging violations of DR 6-101(A)(3) and 7-101(A)(2), and a charge that he had violated DR 1-102(A)(2) (*sic*, [3]) (illegal conduct involving moral turpitude) and (6) (conduct that adversely reflects on fitness to practice law) by using cocaine.

{¶ 2} The parties stipulated before the panel to the admission of testimony and exhibits submitted during relator's hearing to determine if probable cause existed to issue the complaint. This evidence established that:

{¶ 3} 1. Joseph M. Plumbo, Jr. paid respondent $700 in the fall of 1991 to defend him against a drug trafficking charge and to represent him in a divorce

proceeding. Respondent did not respond to Plumbo's attempts to contact him about these cases, and he did not zealously pursue the return of Plumbo's confiscated van or object as requested to the recommendation of a domestic relations referee;

{¶ 4} 2. Doris Giffin paid respondent $600 to sue, if necessary, the previous owners of her home for having misrepresented the condition of the inground swimming pool and to resolve a loan dispute. Respondent did not reply to Giffin's telephone calls or correspondence during 1991 and1992, and he missed scheduled appointments. Giffin arranged for the repair of the pool on respondent's advice, but has since received no assistance from him;

{¶ 5} 3. Kenneth R. Maxey paid respondent $550 in March 1991 to enjoin an alleged violation of an employment contract by a former employee. Respondent failed to file the suit, even though he represented to Maxey that he either had or was about to do so. Maxey requested the return of his case file in December 1991 and, for the next six months, he called or wrote to respondent almost daily to renew his request. Respondent all but ignored Maxey's efforts, finally returning the file on the date of the probable cause hearing, when he apparently also repaid Maxey's retainer;

{¶ 6} 4. Gloria Lakes paid respondent $185 in February 1992 to file a divorce action. Respondent filed the complaint and obtained an order against Lakes's husband to vacate their home. Lakes subsequently had trouble reaching respondent about the divorce proceeding. When respondent did not appear at the final hearing in the action, she secured a continuance of the hearing on her own and hired another attorney.

{¶ 7} Other evidence submitted for the panel's review established that:

{¶ 8} 1. Sherri Gibbs paid respondent $350 in March 1993 to sue for repairs to an automobile she had purchased in 1992. Respondent gave Gibbs the impression that he had filed suit when he had not, and he subsequently failed to return her telephone calls. Gibbs retained another attorney in or around March 1994;

{¶ 9} 2. Jeanne Heater paid respondent $430 in May 1994 to defend her against DUI and drug abuse charges, among others. She claimed that respondent did not tell her she was required to attend the pretrial in her case and that a bench warrant was issued for her arrest when she failed to appear. Respondent admitted he told Heater that the pretrial had been continued and that he did not know whether a warrant had been issued for her arrest. However, he insisted that he had appeared at the pretrial on Heater's behalf just before he entered a rehabilitation program for substance abuse. Heater also retained another attorney due to respondent's neglect;

{¶ 10} 3. Respondent agreed in the spring or summer of 1991 to defend Alyce Irhmann Bowling in a suit arising from an automobile collison and to countersue on a contingency fee basis. Respondent also agreed to represent Bowling in a dispute with her insurance company over coverage and to attempt to obtain the release of a $6,500 bond she had posted with the Ohio Bureau of Motor Vehicles. Bowling was unable to contact respondent for long periods after she hired him. Finally, in September 1992, Bowling was able to retrieve her file from respondent and retain another attorney.

{¶ 11} The panel determined from this evidence, a stipulation of misconduct in the Plumbo, Giffin, Maxey, and Lakes cases, and respondent's acknowledged failure to adequately represent Gibbs and Heater, that he had violated DR 6-101(A)(3) and 7-101(A)(2) with respect to all these clients and Bowling. Respondent attributed his misconduct, for the most part, to his abuse of alcohol and use of cocaine. Thus, the panel also found that he had violated DR 1-102(A)(2) (*sic*, [3]) and (6).

{¶ 12} The panel continued the first hearing scheduled in this case to allow for respondent's treatment for alcohol and substance abuse and, in recommending a sanction for his misconduct, it considered his June 1994 release from a five-week rehabilitation program. Professionals associated with that program diagnosed respondent as cocaine dependent and an abuser of alcohol. In respondent's

discharge summary, a therapist reported that respondent's prognosis for recovery was poor because, while he was highly motivated, he had not accepted his addiction emotionally and had not developed a support network.

{¶ 13} The panel recommended that respondent be suspended from the practice of law for a period of two years, and that the suspension period be suspended on the conditions that he enroll and complete the Ohio Lawyers Assistance Program ("OLAP"), that he continue regular attendance at AA/NA meetings, and that he periodically submit to random testing for alcohol and drug use.

{¶ 14} The board adopted the panel's findings and recommendation, but modified the recommended sanction to a two-year suspension period, with eighteen months suspended upon the conditions set forth by the panel, and a six-month actual suspension of respondent's license.

———————————

*Gary Kaup* and *Donald C. LeRoy*, for relator.
*F. Joseph Schiavone*, for respondent.

———————————

***Per Curiam.***

{¶ 15} We have thoroughly reviewed the record and agree with the board's findings of misconduct. However, we are not convinced that respondent has fully accepted his addictions or committed himself to a recovery program. Thus, we cannot concur in the sanction recommended by the board.

{¶ 16} Back in November 1992, when he was called to testify at relator's probable cause hearing, respondent acknowledged that his alcohol consumption and drug use had interfered with his ability to represent clients. He described other problems either caused or aggravated by his drinking or drug use, including his diabetic condition, and he claimed, in effect, to have hit bottom. He said he had already stopped using cocaine and marijuana, and he recognized that his drinking

"ha[d] to be stopped." He promised to get help. In response to the suggestion that he seek counselling with OLAP, he said, "* * * if that's going to help, I'll certainly do it, I'll do everything I have to * * * [to keep my license to practice law.]"

{¶ 17} But respondent did not contact OLAP. And while he eventually entered a treatment program, he did not do so until May 1994, one and one-half years after the probable cause hearing and just before the initially scheduled panel hearing. In the interim, respondent neglected the cases of at least two more clients.

{¶ 18} Moreover, respondent's testimony at the panel hearing was suspiciously familiar. He described how he had again "bottomed out," adding that he "really" had this time. He offered assurances that he was prepared to take whatever steps sobriety required, just as he had during the prior proceeding. Respondent also admitted to the panel that he had indulged in alcohol and/or drug use only a week or two before his appearance, essentially the same confession he made nearly two years before.

{¶ 19} For these reasons, the sanction recommended by the board is inconsistent with the indefinite suspension we imposed in *Cincinnati Bar Assn. v. Farr* (1995), 72 Ohio St.3d 224, 648 N.E.2d 1338, another case in which an attorney attributed his repeated neglect to alcohol abuse, but had not committed himself completely to recovery. We, therefore decline the board's recommendation and order that respondent be suspended from the practice of law in Ohio indefinitely. Costs taxed to respondent.

*Judgment accordingly.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

WRIGHT, J., dissent.

_____

**WRIGHT, J., dissenting.**

{¶ 20} I would accept the recommendation of the panel hearing this matter or that of the board. The panel and the board believed that the respondent should be suspended from the practice of law for two years with a part of or all of that term suspended and should be placed on probation on the conditions set forth by the panel.

—————————————